AO 106 (Rev. 04/10) Application for a Search Warrant



# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

| In the Matter of the Search of | |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| A CELLULAR PHONE BEING HELD IN THE PERSONAL PROPERTY OF ALEXANDER TIMOTHY CROSS AT THE PIEDMONT VIRGINIA REGIONAL JAIL LOCATED AT 801 INDUSTRIAL PARK RD, FARMVILLE, VA 23901 | ) ) ) ) |

Case No. 3:19 SW 305

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A, hereby incorporated by reference.

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please See attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 922(g) | Possession of a Firearm by a Prohibited Person |
| 18 U.S.C. 922(d) | Sale of a Firearm to a Prohibited Person |
| 18 U.S.C. 115 and 871 | Threatening a Federal Official or the President of the United States |

The application is based on these facts:

Please see attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael Talbert, ATFE Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____11/04/2019_____

/s/
David J. Novak
**United States District Judge**
*Judge's signature*

City and state: Richmond, Virginia

David J. Novak, United States District Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

IN THE MATTER OF THE SEARCH OF:
A CELLULAR PHONE BEING HELD IN
THE PERSONAL PROPERTY OF
ALEXANDER TIMOTHY CROSS AT THE
PIEDMONT VIRGINIA REGIONAL JAIL
LOCATED AT 801 INDUSTRIAL PARK RD,
FARMVILLE, VIRGINIA

Case No. 3:19SW305

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Michael Talbert, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—an

electronic device— more fully described in Attachment A, which is currently at the Piedmont

Virginia Regional Jail located at 801 Industrial Park Rd, Farmville, Virginia, and the extraction

from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and

Explosives ("ATF"), United States Justice Department, and am currently assigned to the

Richmond Field Office, and have been so employed for over twenty eight years.  I have made

applications and executions of numerous search and arrest warrants for violations of Federal

Firearms and Narcotics Laws, which have resulted in successful prosecution. I am a graduate

of the Federal Law Enforcement Training Center, the ATF National Academy, and have

received extensive training in firearms and narcotics enforcement techniques, firearms and

narcotics interdiction, methods of firearms and narcotics trafficking and distribution from various state and federal agencies.

3.      As a Special Agent, I am authorized to investigate violations of the laws of the United States, and as a law enforcement officer, I am authorized to execute warrants issued under the authority of the United States.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the electronic device described in Attachment A contains information related to possession of a firearm by a prohibited person, specifically a person who has been adjudicated a mental defective or who has been committed to a mental institution, in violation of Title 18, United States Code, Sections 922(g)(4) and 924(a)(2), sale or transfer of a firearm to a prohibited person, in violation of Title 18, United States Code, Section 922(d), threatening a federal official, in violation of Title 18, United States Code, Section 115, and threatening the President of the United States, in violation of Title 18, United States Code, Section 871.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.      The property to be searched is a cellular phone being held in the personal property of Alexander Timothy Cross at the Piedmont Virginia Regional Jail (the "Device"), currently located at 801 Industrial Park Rd., Farmville, Virginia, within the Eastern District of Virginia.

7.      The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

8.      On or about February 10, 2016, CROSS was arrested for felony assault on a law enforcement officer in Amelia County, Virginia.

9.      Subsequent to this arrest, on or about September 27, 2016, Amelia County General District Court Judge Mayo Gravatt adjudged, ordered, and committed CROSS, who was represented, to an involuntary civil commitment at the Central State Hospital for mental health treatment.  CROSS was found to be "unrestorably incompetent to stand trial."

10.     On or about September 22, 2019, sworn deputies of the Buckingham County Sheriff's Office in Buckingham County, Virginia, learned from three confidential sources that CROSS, who had been released several years ago from his involuntary civil commitment, had stated that he possessed firearms and that he had an "execution list."

11.     Acting on this information, on or about September 25, 2019, deputies with the Buckingham County Sheriff's Office obtained and executed a state search warrant for evidence of purchase, possession, or transportation of firearm by persons involuntarily admitted or ordered to outpatient treatment.

12.     The search warrant was for the residence of CROSS, located at 6501 S. James Madison Highway, Dillwyn, Virginia, which is in the Western District of Virginia.

13.     During the search, deputies recovered three firearms from CROSS's residence. These firearms included:

      a.  an HS PRODUKT (IM METAL), Model XDM COMPACT .45 caliber pistol, SN: MG555415, manufactured in Croatia and imported into the United States

3

by Springfield INC.;

    b.  a Smith and Wesson, model M&P 15, SN: TJ75291, caliber .556 and or .223, rifle; and

    c.  a Ruger LCP, SN: 373-85001, .380 caliber pistol.

14.    Additionally, deputies recovered a large amount of ammunition and a tactical vest. The following picture displayed in Exhibit 1 shows the items recovered during the search:

Exhibit 1



15.    I have been accepted in the Western District of Virginia as an expert in the field of firearms identification and interstate nexus. Based on my past training and experience the aforementioned three items are "firearms" as defined by federal law. Furthermore, none of these

firearms were produced or manufactured in the Commonwealth of Virginia and therefore have at some point in the past traveled in foreign and or interstate commerce.

16.     Deputies also recovered multiple documents containing handwritten lists of numerous public officials. These documents listed the President of the United States, Donald J. Trump, along with other federal officials.

17.     On September 25, 2019, CROSS was arrested for a misdemeanor possession of firearms by a person previously deemed mentally incompetent by the courts in Buckingham County, Virginia.

18.     CROSS was transferred to the Piedmont Virginia Regional Jail located at 801 Industrial Park Rd, Farmville, Virginia, which is in the Eastern District of Virginia.

19.     One of the items held by the Piedmont Virginia Regional Jail is the Device, which is currently located held in the personal property under the name "Alexander Timothy Cross."

20.     On September 26, 2019, USSS Special Agent Richard Moore interviewed CROSS at the Piedmont Regional Jail in Farmville, Virginia. Special Agent Moore was investigating CROSS regarding credible threats to the President of the United States and other United States Government officials, and other possible violations of federal law.

21.     During the course of this interview, CROSS told Special Agent Moore that he had possessed the firearms recovered from his residence. CROSS further stated that he knew he was not allowed to have the firearms and that it was wrong to have them.

22.     CROSS told Special Agent Moore, he had purchased the Smith and Wesson rifle and the Ruger .380 pistol previously described, from an unknown male. CROSS had met the seller online and they agreed to meet at Zions Crossroad, Virginia.

23.     CROSS informed Special Agent Moore that he had purchased the aforementioned .45 caliber pistol at a yard sale, which he had found on Facebook.

24.     CROSS was shown some of the documents listing public officials and CROSS referred to it as a "hit list." Specifically, CROSS referred to three numbers written, "21-11-21" as the number of rounds in his gun's magazine and that each round was for one of the officials. When asked about whether he wished to kill the President of the United States, CROSS stated, "I can't say I wouldn't," and went on to say, "I would hurt them all for a purpose." CROSS then said "I'm not going to hunt these people."

25.     Explaining the "hit list," which included multiple federal officials, CROSS stated that he was going to kill all of them at base of the Washington Monument. CROSS stated he would do this on his birthday, but that he was waiting for doomsday to arrive.

26.     I know from my training and experience that individuals routinely use cellular phones to conduct their affairs, including to conduct business, acquire goods and communicate with others. In fact, it has become routine and widespread for many individuals to access the Internet almost exclusively through their mobile devices because of the ease of doing so with modern smart phone applications and the quickness with which people can respond to Internet communications and other online activity because they regularly carry their mobile phones around with them.

## TECHNICAL TERMS

27.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication

through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

8

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, which is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "Wi-Fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a

9

telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

28.  Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS, personal digital assistant and access the Internet.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

30.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

      a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

      b.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

      c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      d.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review

11

team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

31. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

32. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

33.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Device described in Attachment A to seek the items described

in Attachment B.

Respectfully submitted,

Michael Talbert

Special Agent, Bureau of Alcohol, Tobacco,
Firearms, and Explosives

Subscribed and sworn to before me
on November _9th_, 2019

/s/

David J. Novak
United States District Judge

UNITED STATES ~~MAGISTRATE~~ JUDGE

District

13

## **ATTACHMENT A**

1.      The property to be searched is a cellular phone being held in the personal property of Alexander Timothy Cross at the Piedmont Virginia Regional Jail located at hereinafter the "Device." The Device is currently located at 801 Industrial Park Rd, Farmville, VA 23901.

2.      This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

1.      All records relating to violations of possession of a firearm by a prohibited

person, specifically a person who has been adjudicated a mental defective or who has been

committed to a mental institution, in violation of 18 U.S.C. § 922(g)(4) and 924(a)(2), sale or

transfer of a firearm to a prohibited person, in violation of 18 U.S.C. § 922(d), threatening a

federal official, in violation of 18 U.S.C. § 115, and threatening the President of the United

States, in violation of 18 U.S.C. § 871, those violation involving Alexander Timothy Cross,

including:

> a.  Any documents, communications, or financial records related to the acquisition or
>     attempted acquisition of firearms, ammunition, and related equipment;
>
> b.  Any documents or communications related to threatening a federal official or
>     threatening the President of the United States.

2.      Evidence of user attribution showing who used or owned the Device at the time

the things described in this warrant were created, edited, or deleted, such as logs, phonebooks,

saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items

of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that

can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored

information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant.  The review of this electronic data may be conducted

by any government personnel assisting in the investigation, who may include, in addition to law

enforcement officers and agents, attorneys for the government, attorney support staff, and

2

technical experts.  Pursuant to this warrant, the ATF may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.